558 So.2d 834 (1990)
Aubrey E. MOORE
v.
Vickie W. MOORE.
No. 07-CA-59286.
Supreme Court of Mississippi.
February 28, 1990.
*835 Joe Clay Hamilton, Meridian, Walter J. Eades, Vaughn & Dickinson, Gulfport, for appellant.
William B. Jacob, Daniel P. Self, Jr., Joseph A. Kieronski, Jr., Self & Jacob, Meridian, for appellee.
Before HAWKINS, P.J., and ANDERSON and BLASS, JJ.
ANDERSON, Justice, for the Court:

STATEMENT OF THE FACTS
Vickie W. Moore [Vickie] and Aubrey E. Moore [Aubrey] were married on November 24, 1972. On December 16, 1986, they were granted a divorce on the grounds of irreconcilable differences by judgment of the Chancery Court of Lauderdale County. Incorporated in this judgment was a Property Settlement and Custody Agreement, which outlined the duties and responsibilities of the parties. On May 21, 1987, Vickie filed a complaint against Aubrey for his failure to abide by the judgment of divorce.
A hearing on this contempt charge was to be held on June 30, 1987, but it was continued pursuant to the wishes of both parties. In the meantime, the parties entered a temporary agreement granting temporary relief pending a final hearing, which on July 21, 1987, the chancellor adopted and made a part of his order granting temporary relief. In his temporary order, the chancellor enjoined the parties from bothering or harassing each other.
On September 15, 1987, a hearing began on Vickie's complaint. At the conclusion of the day's testimony, the chancellor continued the case until December 7, 1987, in order to allow the couple to reach a settlement on the issues, especially the visitation schedule. He assured the parties that the case had not been tried to a conclusion, and he again enjoined them from harassing each other.
Because of more continuances, the hearing was rescheduled for March 11, 1988. On January 21, 1988, however, Vickie filed a second motion for contempt. Consequently, the chancellor heard evidence on both complaints at the March 11 hearing. At the conclusion of the hearing, the chancellor made detailed findings of fact and concluded that Aubrey had wilfully disregarded the court order incorporating the property settlement agreement; therefore, he was in contempt, and the chancellor sentenced him to ten days in the Lauderdale County Jail.
The chancellor did not end there. In addressing the contempt charges alleged in *836 Vickie's complaint filed in January, the chancellor found Aubrey in contempt and sentenced him to thirty days in jail. In his opinion the chancellor emphasized the fact that at the conclusion of the September hearing, he admonished Aubrey concerning his obligation to obey the court order. Even after this warning Aubrey continued to harass Vickie.
Aubrey timely filed his notice of appeal, prosecuted an appeal bond and was released from jail pending the outcome of the appeal.

PROPOSITION I

THE FAILURE OF THE COURT TO INFORM THE APPELLANT OF HIS CONSTITUTIONAL RIGHT AGAINST SELF-INCRIMINATION AND OF THE NATURE OF THE CHARGES AGAINST HIM WAS REVERSIBLE ERROR.
During the hearings Vickie and Aubrey were represented by counsel. In proving the allegations in her complaint, Vickie called witnesses and testified in her own behalf. She also called Aubrey, an adverse witness, to testify. During his testimony, he made damaging admissions by testifying extensively about his behavior and related matters alleged in both complaints. When Aubrey took the stand, the chancellor did not inform him of his privilege against self-incrimination. More importantly Aubrey's counsel failed to make any objection to the defendant testifying.
Now Aubrey complains to this Court that it was reversible error for the chancellor not to inform him of his privilege.

DISCUSSION OF LAW
One of the most settled premises in our constitutional jurisprudence is that no individual may be compelled to testify against himself or to offer testimony which might render him liable to a criminal prosecution. Wright v. McAdory, 536 So.2d 897, 903 (Miss. 1988). This is so whether he is a witness in a civil, criminal, or quasi-criminal proceeding. Allen v. Illinois, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986); In re Knapp, 536 So.2d 1330 (Miss. 1988); and Morgan v. United States Fidelity & Guaranty Co., 222 So.2d 820 (Miss. 1969). Courts are particularly concerned with the privilege and its relationship with criminal prosecutions because there is a practical reality of juror prejudice and misunderstanding when an individual gets on the witness stand and invokes his privilege on a question by question basis. Knapp, 536 So.2d at 1334. Moreover, "[e]xperience and common sense have taught that the only way the privilege may in fact be secured in a criminal prosecution is that the accused have the right, if he wishes to exercise it, not to take the witness stand at all." Id.
It first must be understood that what we have in the case sub judice is not a criminal prosecution, but a hearing on both civil and criminal contempt. The nature of civil and criminal contempt is outlined below:
If the purpose of the proceedings is to coerce action or non action by a party the order of contempt is characterized as civil. This type contempt is ordinarily instituted by one of the parties to the litigation who seeks to coerce another party to perform or cease performing an act. The order of contempt is entered by the court for the private benefit of the offended party... .
On the other hand, a criminal contempt proceeding is maintained solely and simply to vindicate the authority of the court or to punish otherwise for conduct offensive to the public in violation of an order of the court. [citations omitted].
Jones v. Hargrove, 516 So.2d 1354, 1357 (Miss. 1987); see also, Varvaris v. State, 512 So.2d 886, 887 (Miss. 1987). Accord Gadson v. Gadson, 434 So.2d 1345, 1349 (Miss. 1983) (Robertson, Hawkins, and Prather, J., specially concurring) (those proceedings conducted to vindicate authority of the court are quasi-criminal). However, the same act which constitutes civil contempt may equal criminal contempt as well. Griffith, Mississippi Chancery Practice, § 666 (2d ed. 1950).
Just as any other vital right, the privilege against self-incrimination can be *837 waived so long as it is done so voluntarily and knowingly. See, Sanders v. State, 440 So.2d 278, 283 (Miss. 1983); see also Phillips v. State, 421 So.2d 476, 479-83 (Miss. 1982) (the right to confront and cross-examine prosecution's witnesses); Thomas v. State, 472 So.2d 425, 426 (Miss. 1985) (the right to a jury trial). Aubrey waived his privilege of self-incrimination when he took the witness stand and testified on the merits of the case. Hentz v. State, 496 So.2d 668, 673 (Miss. 1986); Jones v. State, 381 So.2d 983, 993 (Miss. 1980); see also, Autry v. State, 230 Miss. 421, 92 So.2d 856 (1957). Moreover, when he opened his mouth to discuss the merits of the case, Aubrey also opened the door to cross-examination and impeachment to the same extent as any other witness in the same situation. Hentz, supra, at 673. As the Autry Court explained:
His [the defendant's] voluntary offer of testimony upon any fact is a waiver as to all other relevant facts because of the necessary connection between them all. Under this rule the accused by taking the witness stand in his own behalf waives the constitutional guaranty against compulsory self-incrimination not only as to matters about which he has given testimony in chief; but also concerning any matter pertinent to the issue on trial regardless of the extent of the direct examination, and cannot then refuse to testify to any fact which would be competent evidence in the case if proved by any other witness.
The waiver by the accused is not partial. Having once cast aside the cloak of immunity, he may not resume it at will whenever cross-examination may be inconvenient or embarrassing.
92 So.2d at 861-62.
Aubrey insists that his case is different because he neither offered himself as a witness nor voluntarily took the stand in his own behalf. We, on the other hand, believe that the decision in Autry applies to Aubrey just as it applies to a criminal defendant. Since Aubrey's case is a quasi-criminal proceeding, however, there is a difference. Therefore, we must look to an analogous case for some direction.
Mississippi State Bar v. Attorney L, another quasi-criminal proceeding, involved the taking of a deposition of an attorney who had been formally cited by the Mississippi State Bar [MSB]. 511 So.2d 119 at 120, 121 (Miss. 1987). In taking the deposition, MSB's attorney asked Attorney L "certain background questions, including [his] name, address and occupation, and then proceeded for almost 100 transcribed pages to ask Attorney L a wide-ranging variety of questions almost all of which were directly or indirectly related to the allegations of the Formal Complaint." Id. Instead of answering any of these questions, Attorney L asserted his constitutional privilege against self-incrimination. MSB moved for entry of an order compelling Attorney L to answer all questions and the Presiding Judge so ordered. Id. at 121. This Court held that those questions that were directly or indirectly related to any aspect of the charges in the Formal Complaint were subject to Attorney L's Fifth Amendment privilege because he had asserted it. But, he had to answer the innocuous questions. Id. at 125.
The case sub judice is not much different. Unlike the defendant's rights in a purely criminal proceeding, Aubrey had no right to forbid Vickie from questioning him altogether. Once Vickie asked Aubrey anything outside of the innocuous arena, the introductory questions, he should have invoked his privilege.[1] He could have done so on a question by question basis. See, Knapp, 536 So.2d at 1334. Furthermore, Aubrey knew that these proceedings were in response to a motion for contempt filed by his wife. He also knew that any finding of contempt would have subjected him to discipline by the court. We know he was aware of the nature of the proceedings because he filed answers to the motion and *838 requested continuances in order to prepare an adequate defense.
It is important to note that Aubrey was called as an adverse witness on three separate occasions. From the record there is no evidence that Aubrey's counsel requested a "time out" to warn his client not to testify.
We assume that practicing attorneys are fully aware of the duty imposed upon a party to make a contemporaneous objection to testimony that he wants to prevent from becoming a part of the record. We have held firmly onto this requirement consistently even though greater deprivations of liberty on the part of the losing party were involved. See, e.g., White v. State, 532 So.2d 1207 (Miss. 1988) (no objection made to prosecutor's comments; therefore, issue not preserved in this capital case); Moawad v. State, 531 So.2d 632 (Miss. 1988) (failure to object to multi-count indictment and jury instructions yielded defendant life sentence plus forty-five years). See also, Corley v. State, 536 So.2d 1314 (Miss. 1988); Arnett v. State, 532 So.2d 1003 (Miss. 1988); Lockett v. State, 517 So.2d 1317 (Miss. 1987); Irving v. State, 498 So.2d 305 (Miss. 1986); Griffith, Chancery Practice, § 579. But see, Livingston v. State, 525 So.2d 1300 (Miss. 1988) (Heightened scrutiny of capital cases plus fundamental nature of right asserted allows court not to invoke procedural bar rule). Moreover, we have enforced a defendant's non-counseled waiver of his right to be free from self-incrimination even though he faced the gas chamber. See, Johnson v. State, 508 So.2d 1126, 1127 (Miss. 1987); Edwards v. Thigpen, 433 So.2d 906, 907 (Miss. 1983); Evans v. State, 422 So.2d 737, 739 (Miss. 1982). Consequently, we certainly cannot give Aubrey more protection than we give those who face the ultimate punishment.
Aubrey erroneously relies on several cases claiming that a trial court has a duty to inform a witness of his privilege. Without a doubt these cases are distinguishable and his reliance upon them is inappropriate. Only one of these cases merits any discussion. In Evans v. Evans, 193 Miss. 468, 9 So.2d 641 (1942), the plaintiff was seeking to hold the defendant in contempt for failing to pay alimony. Id. 9 So.2d at 641. She presented her testimony and then attempted to call the defendant as an adverse witness, but he objected claiming his privilege against self-incrimination. Id. (emphasis added). Recognizing that this was a quasi-criminal proceeding, the chancellor sustained the objection and maintained that the defendant could not be required to give evidence against himself. The chancellor, however, found the defendant in contempt and sentenced him to jail. This Court reversed because there was not enough evidence to establish that the defendant had refused to obey the decree for alimony in a willful or contumacious manner; therefore the jail sentence was unwarranted. Id. at 642. But, we did agree with the chancellor that the defendant had a right not to testify.
Obviously, the distinguishing point between that case and the case sub judice is that Aubrey failed to raise an objection before he testified at any time during the hearing. His objection was much too late, coming after the chancellor had rendered his opinion. Moreover, without a doubt, the chancellor in the case before the bar found a plethora of evidence demonstrating Aubrey's contempt for the court.
One final note before disposing of this case. In affirming the chancellor's decision, we are concerned with the possibility of counsel's increased efforts to sandbag  "that they may see an error committed below and deliberately refuse to call it to the attention of the trial court or counsel opposite, hoping to build error and likely appellate reversal into the record." Read v. State, 430 So.2d 832, 841 (Miss. 1983). If Aubrey's counsel knew or even believed that the chancellor committed error, he should have alerted him to the mistake. Moreover, if we were to impose a duty on trial judges to put a litigant on notice that he has a particular right or privilege, there would be no need for litigants to have counsel.
The reason that we require contemporaneous objection is to assure that the opposing party has notice of the claim and the *839 opportunity to offer evidence or take curative action if it is necessary. Additionally, the trial judge is also put on notice, and, at that moment, he considers what appropriate action should be taken. Sometimes a mistrial is appropriate; however, sustaining the objection is usually sufficient. Clearly, in this case, waiting for the close of trial was much too late to object to testimony which was incriminating. Any lawyer in this situation, we could assume, would have objected long before the close of trial especially when his client was called to testify on three different occasions.

PROPOSITION II.

THE COMMENTS OF THE CHANCELLOR IN THE PROCEEDINGS BELOW EVIDENCED SUCH BIAS AND PREJUDICE ON HIS PART AGAINST THE APPELLANT AND DENIED HIM HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
The appellant maintains that the following comments by the Court evidenced bias:
BY THE COURT: I don't know that I need any more proof. He is headed to county jail just as fast as he can get there. I will hear any proof you have or anything he has in justification. This witness sat here on the witness stand and admitted he is in total complete disregard of this Court's Order. I would like to hear any justification for it whatsoever. Have a seat. I want to hear from whoever else you have and I won't tolerate that from anybody. [Emphasis Supplied by Appellant].

DISCUSSION OF LAW
In order to determine whether these statements constitute bias, the comments themselves must first be placed in proper context. Firstly, they were made at the conclusion of Aubrey's cross examination and the court's examination of the witness on March 11, 1988. As outlined in the Statement of Facts the chancellor had issued a temporary judgment at the conclusion of Aubrey's testimony on September 15, 1987. In that judgment, the chancellor stated:
I am enjoining both of you from in any way, manner or form, harassing, molesting or bothering the other person until we return to Court to finish this case. What I am saying? Unless it is an emergency or involves the health or well being of your children, you will be in direct contempt of this Court and wilful disobedience of this Court's injunction if you call the other person's home or place of employment or either one of you bothering the other one between now and the conclusion of this trial and if such happens on proper motions filed by either of you, I will immediately stop whatever cases I have and you will be dealt with sternly. If there is anybody that doesn't understand what I said, I will be glad to repeat it. I am encouraging you to leave each other alone from this moment on until we get through with the lawsuit. Any questions about what I am saying?
BY MR. SELF: No questions.
BY MR. HAMILTON: No questions.
(Emphasis added).
Prior to the chancellor's comments to which the appellant now objects, Aubrey explained to the chancellor that he understood the court's order previously issued. He then admitted to calling his ex-wife, and the court did not believe his reason rose to the level of an emergency. This combined with the other evidence that had been presented up to that point could evoke a harmless comment, such as the above, from a chancellor.
In his brief the appellant cites Sivley v. Sivley, 96 Miss. 137, 51 So. 457 (1910), for admonishing judges not to comment on the evidence. However, the vital distinction between Sivley and the case sub judice is that Sivley involved a jury trial. Of course, a chancellor in contempt proceedings sits as judge and jury, weighing the credibility and demeanor of the witnesses and listening to the evidence. Moreover, comments on the evidence in front of a jury are quite different from comments made during a bench trial.
Furthermore, the chancellor does not have to express his feelings in a manner *840 pleasing and delightful to the parties' ears. See, Griffith, Mississippi Chancery Practice, § 94. He fulfilled his duty by continuing to hear all the evidence and rendering his final opinion at the conclusion of the hearing. By doing this, he could determine the proper penalty necessary for Aubrey's non-compliance with his court order.
In any event, Aubrey made no contemporaneous objection when the chancellor made these comments so we will not reverse for that reason as well.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
NOTES
[1] Indeed, Mrs. Moore's counsel asked the innocuous questions concerning Mr. Moore's name, nickname, address, and the amount of time that he spends in Hattiesburg and Meridian. He also identified a copy of the divorce decree and the incorporated property settlement agreement.